UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

BUFFALO SOUTHERN RAILROAD Inc.,

                Plaintiff,

 - against -                                     06 Civ. 3755 (CM)

VILLAGE OF CROTON-ON-HUDSON; GREGORY J.
SCHMIDT, as Mayor of the Village of Croton-on-Hudson;
DANIEL O'CONNOR, P.E., as Engineer and Building
Inspector for the Village of Croton-on-Hudson; RICHARD F.
HERBEK, as Manager of the Village of Croton-on-Hudson;
THOMAS P. BRENNAN, as Trustee on the Village Board of
Trustees; CHARLES A. KANE, as Trustee on the Village Board
of Trustees; ANN GALLELLI, as Trustee on the Village Board
of Trustees; LEO A. W. WIEGMAN, as Trustee on the Village
Board of Trustees; CHRIS KEHOE, as Member of the Village
Planning Board; VINCENT ANDREWS, as Member of the
Village Planning Board; FRANCES ALLEN, as Member of the
Village Planning Board; ROBERT LUNTZ, as Member of the
Village Planning Board; KATHLEEN REIDY, as Member of
Village Zoning Board of Appeals; RHODA STEPHENS, as
Member of Village Zoning Board of Appeals; RUTH WAITKINS,
as Member of Village Zoning Board of Appeals; WITT BARLOW,
as Member of Village Zoning Board of Appeals; and PAUL
ROLNICK, as Member of Village Zoning Board of Appeals,

                Defendants.

-------------------------------------------------------------x

## DECISION AND ORDER GRANTING PLAINTIFF'S
## MOTION FOR A PRELIMINARY INJUNCTION

McMahon, J.:

## Introduction

      Plaintiff is a common carrier by rail in western New York. In March 2006, it entered into

a lease for the property located at 1A Croton Point Avenue in Croton-on-Hudson ("the Yard").

Plaintiff's stated intention is to use the site to expand its business to the Westchester area by converting it into a transloading facility (a site where the contents of rail cars are loaded and unloaded).

For many years prior to 2006, the Yard housed a controversial recycling and waste management center. The Village of Croton-on-Hudson has been involved in litigation against a number of enterprises who own or have operated out of the Yard, including Greentree Realty (the owner), Northeast Interchange Railway, and Metro Enviro Transfer LLC. Plaintiff's lease was signed only a month after the Village Board commenced consideration of the possible condemnation of the site via its power of eminent domain.

And only weeks after two key events – a decision by a Justice of the New York State Supreme Court enjoining waste transfer operations on the site without the Village's consent, and the Village's announcement that acquisition of the site was financially feasible – Plaintiff (whose existence and lease were theretofore unknown to Village officials) filed a complaint in this Court, seeking to enjoin the Village from commencing any eminent domain proceeding and from enforcing other local zoning and building requirements, on the grounds that the Interstate Commerce Commission Termination Act of 1995 preempted all state and local regulation of the site while it is being used in transportation by rail carrier.

The Village contends that plaintiff is not entitled to an injunction, because BSOR has not applied for, let alone acquired, the necessary certificates from the federal Surface Transportation Board that would allow the Yard to be used for common carriage rail operations.

For the reasons set forward below, plaintiff's motion is granted, on conditions set forth below.

**Facts**

The Yard is a triangular parcel of land approximately ten acres in size. It is bounded by property of Metro-North Railroad to the west, by property owned by Croton-on-Hudson and New York State Route 9 to the east, and by privately held land to the north. Affidavit of Albert Feasley, Ex. A. The Yard contains a spur of dead-end track, 1600 feet in length, that intersects a main line of track passing through town at the edge of the Yard. Id. The main line is owned by CSX, a larger rail carrier. Feas. Aff. ¶¶ 5, 12. The Yard also contains a warehouse facility that is connected to the spur, which allows the spur to be used for unloading the contents of rail cars onto trucks and vice versa (termed a "transload facility"), several storage yards, a one-story office building, a parking lot, and small areas of land used for drainage and storing debris.

Since 1979, the Yard has been zoned "L-1" under the Village Zoning Law – permitting "Light manufacturing, assembly, converting, altering, finishing, cleaning or any other processing or storage of products." Zoning Code § 230-18B(2).

A. History

In the 1970s and 1980s, the Yard was owned by a series of private individuals, who used it as a construction yard, a lot for storing sand, and a truck repair depot.

Since at least 1984, the Yard has been used by successive owners and lessees as a waste transfer station and wood recycling center. Each was required to get a permit from the Village to operate the Yard as a waste storage facility.

In 1997, the Yard was sold to Greentree Realty, Inc., who in turn leased it to Metro Enviro LLC. One year later, on May 4, 1998, Metro Enviro LLC received a permit from the

Village to operate a recycling center there. Affidavit of Marianne Stecich ¶ 10. Over the next few years, Metro Enviro allegedly violated several conditions of the permit, such as accepting more than the permitted amount of waste and failing to adequately train employees. Id. ¶¶ 10-11; see also Matter of Metro Enviro Transfer, LLC v. Village of Croton-on-Hudson, 5 N.Y.3d 236, 239, 800 N.Y.S.2d 535 (2005). In 2001, when the permit expired, the town undertook an extensive review of the site and Metro Enviro's operations there. On January 27, 2003, the Village Board voted not to reissue the permit. Stec. Aff. ¶ 11.

Metro-Enviro LLC sought an Article 78 review of the Village's decision in the Supreme Court in Westchester County. Justice Francis Nicolai ultimately found in favor of the company and ordered the Village to issue the permit. On appeal, the Second Department overturned Judge Nicolai's decision and upheld the Village's determination. Matter of Metro Enviro Transfer, LLC v. Village of Croton-on-Hudson, 7 A.D.3d 625 (2d Dept. 2004), aff'd 5 N.Y.3d 236, 800 N.Y.S.2d 535 (2005).

On July 18, 2005, the Village passed a resolution prohibiting Metro Enviro's facility from accepting new waste – essentially halting its operations. Stec. Aff. ¶ 14. Greentree Realty LLC (owner of the Yard) and Metro Enviro Transfer LLC (successor to Metro Enviro LLC) sought to enjoin enforcement of the resolution, on the grounds that the use of the Yard as a recycling center was a prior non-conforming use under the Zoning Code. Justice Nicolai denied Metro Enviro's motion for a preliminary injunction. See Greentree Realty LLC v. Village of Croton-on-Hudson, No. 11872/05 (Westchester Cty. Sup. Ct. August 25, 2005).

Around the same time, a separate but related entity, Northeast Interchange Railway LLC ("NIR"), reached an agreement to take over Metro Enviro's lease and operations and begin its

own waste management and recycling operation from the Yard. It applied to the New York State Department of Environmental Conservation and to Westchester County for permits to handle solid waste. Stec. Aff. ¶ 22. In December 2005, these permits were granted, along with a permit allowing the operation of a waste processing facility in the Yard. Stec. Aff. ¶ 25.

NIR also filed a Notice of Exemption Transaction with the federal Surface Transportation Board ("STB") seeking STB approval to operate as a common carrier by rail over the 1600-foot stretch of track in the Yard. Stec. Aff. Ex. 4. Prior to this point, there is no evidence of the Yard's being used in this fashion; the state court decisions dealt only with the site of a recycling center.

The Village opposed NIR's application, leading the STB to stay the effectiveness of NIR's Notice of Exemption.[1] Northeast Interchange Ry., STB Fin. Docket No. 34734 (S.T.B. August 5, 2005). After additional review, NIR's Notice of Exemption was formally rejected. The STB held that the abbreviated review procedures available in notice of exemption proceedings were inappropriate for the substantial scope of NIR's request (NIR never previously having engaged in common carrier operations). Northeast Interchange Ry., STB Fin. Docket No. 34734 (S.T.B. November 17, 2005). NIR was granted leave to resubmit a full application or a formal petition for exemption. Id.

On February 6, 2006 – apparently before any such application was made – the Village of Croton-on-Hudson commenced public hearings pursuant to New York Eminent Domain Procedure Law § 201, to begin consideration of condemning the Yard. The Village's stated

---

[1] Notices of Exemption before the STB, as a procedural matter, become effective if they are not affirmatively stayed. See Stec. Aff., Ex. 6 at 2.

intent was to use the property for municipal office space and as a storage lot for salt, sand, and municipal vehicles. Stec. Aff. ¶ 30, Opp. at 3. The Village commissioned an appraisal of the site, to ascertain what a fair acquisition price would be.

On March 3, unbeknownst to the Village, R.S. Acquisition Inc., as lessee of the property from Greentree, subleased the site to plaintiff. See *infra.*

In April 2006, Judge Nicolai issued an injunction in favor of the Village, prohibiting NIR's proposed use of the Yard as a waste transfer station without the appropriate Village permits. Decision, <u>Village of Croton-on-Hudson v. Northeast Interchange Ry. LLC & Greentree Realty, LLC</u>, No. 22176/05 (Westchester Cty. Sup. Ct. April 27, 2006). Plaintiff's existence was still a secret, so it was not a party to that proceeding.

On or around April 18, 2006, the town released the results of its appraisal of the site, which indicated that the site could be acquired for approximately $5 million, a "doable number" according the Village Mayor, Gregory Schmidt. Robert Marchant, <u>Buyout of Croton Waste Facility Estimated to Cost $5M</u>, Journal News, April 18, 2006.

To date, the Village has not made a final decision on whether to acquire the Yard. Stec. Aff. ¶ 33. The entry of a temporary restraining order by this court has, of course, stayed the running of the 90 day period after the public hearing within which the Village is statutorily require to publish its determinations and findings pursuant to N.Y. EDPL § 204.


<u>B. Buffalo Southern Railroad</u>

Buffalo Southern Railroad (BSOR) is a common carrier by rail in western New York, engaged in the transportation of freight. Affidavit of Albert Feasley, ¶ 3. It owns a stretch of

track near Buffalo, and it has entered into "interchange agreements" with other rail carriers allowing it to ship freight by rail across the state. It is designated as a Class III rail carrier by the STB, which means that it has annual revenues of under $20 million. Id. ¶ 2; see also 49 C.F.R. § 1201 1-1. BSOR avers that it has not heretofore transported solid waste as a regular part of its business.

On March 3, 2006, one month after the Village started investigating the possibility of eminent domain, BSOR leased the Yard from RS Acquisition Co., which in turn had leased it from Greentree. Feas. Aff. Ex. B. NIR, the prior tenant, had apparently abandoned its interest in the Yard, although when and how it did so is unexplained. BSOR's stated purpose for acquiring the Yard was to expand its service area from western New York to the Westchester area. Id. ¶ 10. It now holds itself out as a common carrier at the Yard, including offering transloading and switching services there. Id. ¶ 11. It has never sought STB approval to operate as common carrier at or from the Yard, and alleges that it need not do so.

Plaintiff has commenced some operations in the Yard, though they have been minimal to date.[2] On March 30, 2006, it permitted CSX to use the Yard to load 14 rail cars for shipment via CSX tracks. Second Affidavit of Albert Feasley, ¶¶ 5, 9. Coastal Distribution LLC, a construction firm, has signed an agreement with BSOR for the shipment of construction materials from western New York to Westchester, to be offloaded in the Yard. Affidavit of Joseph Rutigliano, ¶¶ 6-7. At least one other enterprise, Hanson Aggregates Inc., has expressed interest in using common carrier services at the Yard once the legal status of the Yard is

---

[2] According to nearby observers, there is no staff or train traffic at the Yard on weekdays. Affidavit of Charles Kane, ¶¶ 6-7.

resolved. Affidavit of Daniel M. Meehan, ¶ 8.

As of the date of this opinion, plaintiff has not reached an interchange agreement with CSX, the owner of the main rail line through town.[3] 2d Feas. Aff. ¶ 4. Absent such an agreement, BSOR's carriage of freight starts and stops within the confines of the Yard.

## C. The Instant Action

On May 17, 2006, BSOR filed suit against the Village of Croton-on-Hudson and various Village employees, seeking to enjoin the Village's incipient eminent domain proceeding and to bar the enforcement of Village regulations against the Yard. BSOR claims that both the Interstate Commerce Commission Termination Act, 49 U.S.C. §§ 10101-11908 (2000) ("the ICCTA") and the dormant Commerce Clause preempt state action against BSOR's operations.

Until the filing of this lawsuit, the Village was unaware that BSOR had leased the Yard. Stec. Aff. ¶ 5. To date, the Village has not attempted to enforce any Village regulation against the Yard. Id.

On May 24, 2006, BSOR attempted to ship three rail cars containing building materials for Coastal LLC to the Yard. When the cars arrived at the CSX-owned track, CSX refused to deliver the cars to the Yard because plaintiff had no interchange agreement with CSX. Letter

---

[3] An interchange agreement is an agreement between two rail carriers agreeing to offer joint common carrier services at a given location. Even absent an interchange agreement, BSOR asserts that CSX is nonetheless obliged to accept BSOR shipments under its statutory obligation as a common carrier (49 U.S.C. § 11101) and under the terms of the Association of American Railroads (AAR) Interchange Rules. 2d Feas. Aff. ¶ 5. CSX contests these assertions. Letter from Paul Hitchcock dated May 31, 2006 at 2.

from Peter McManus Dated May 30, 2006, at 1-2.[4]

## Discussion

In order to obtain a preliminary injunction, an applicant must show (1) that s/he is likely to suffer irreparable injury if such relief is denied and (2) there is either a likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation, with a balance of hardships tipping decidedly in the applicant's favor.  See In re Feit & Drexler, Inc., 760 F.2d 406, 415 (2d Cir. 1985).

Additionally, where, as here, a private party seeks to enjoin enforcement of state power, the public interest must be balanced against the private interest asserted by the plaintiff. Brody v. Village of Port Chester, 261 F. 3d 288 (2d Cir. 2001).

_____

[4] This Court has received a letter dated May 31, 2006, from CSX's general counsel Paul Hitchcock, regarding this incident. Counsel asserts that, in his opinion, "There is no basis for CSX to recognize [BSOR's] alleged status [as a common carrier by rail at the Yard] absent some direction from the STB or this Court." Letter from Paul Hitchcock Dated May 31, 2006 at 2. According to counsel, common carrier status requires certification from the STB; BSOR's current operations at the Yard are no more than "industrial switching" operations. Id. at 1-2. CSX is presently willing to deliver these three cars on an ad hoc basis if the STB grants its permission for such an arrangement. Alternatively, it will enter into something called a "sidetrack agreement," without prejudice to BSOR's legal position, pending resolution of its status. Id. at 3. Notwithstanding its belief that BSOR requires STB authorization, CSX states that it does not seek to intervene in this matter and will abide by the ultimate decision of this Court regarding BSOR's operations. Id.

As stated at oral argument, the Court credits CSX's assertion that it is a neutral third party and that the actions described in the text  were not dictated by the Village. Given the possibility of third party liability for aiding and abetting violations of Chapter 109 of the ICCTA (see below), CSX's position is perfectly understandable and is in its self-interest. Plaintiff's hypothesis of a "conspiracy" between CSX and the Village is simply not credible.

A. Irreparable Injury

BSOR contends that the Village's eminent domain proceedings against the Yard would foreclose BSOR's ability to do business in the area entirely. Furthermore, it asserts that any delay in its operations would cause the loss of potential business and customer goodwill, including its arrangement with Coastal LLC. Such factors have been held to constitute irreparable injury in an analogous case. Coastal Distribution LLC v. Town of Babylon, No. 05 Civ. 2032, 2006 WL 270252, *3-4 (E.D.N.Y. Jan. 31, 2006).

B. Likelihood of Success on the Merits

Plaintiff's principal argument is that the I.C.C. Termination Act ("ICCTA") preempts any action that might constitute state or local regulation of a common carrier by rail. The ICCTA, in relevant part, vests exclusive jurisdiction over "transportation by rail carriers," which includes the yards and facilities used by such carriers in providing rail transport, in the federal Surface Transportation Board.[5] 49 U.S.C. § 10501(b)(1) (2000). It further gives the STB exclusive

---

[5] Section 10501 states in full:

The jurisdiction of the Board over–

(1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and

(2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State,

is exclusive. Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law.

jurisdiction over "the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities." 49 U.S.C. § 10501(b)(2) (2000).

In <u>Green Mountain R.R. Corp. v. Vermont</u>, 404 F.3d 638, 645 (2d Cir. 2005), the Second Circuit held that the ICCTA preempted the enforcement of local zoning ordinances against a rail carrier seeking to construct a rail yard on land abutting a line of track. "The plain language of section 10501 reflects clear congressional intent to preempt state and local regulation of integral rail facilities." <u>Id.</u> However, the court held that local authorities may continue to exercise "traditional police powers," provided that:

> the regulations protect public health and safety, are settled and defined, can be obeyed with reasonable certainty, entail no extended or open-ended delays, and can be approved (or rejected) without the exercise of discretion on subjective questions.

<u>Id.</u> at 643. "Electrical, plumbing and fire codes, direct environmental regulations enacted for the protection of the public health and safety, and other generally applicable, non-discriminatory regulations and permit requirements would seem to withstand preemption." <u>Id.</u>

It is against the backdrop of <u>Green Mountain</u> that I consider this application for injunctive relief.

*1. Local Regulation of the Yard, Including The Exercise*
*of the Power of Eminent Domain, Is Preempted by the ICCTA.*

According to plaintiff, the Village's exercise of its eminent domain power against the Yard is barred by the terms of section 10501. What case law there is on the matter supports this argument: the ICCTA has been held to preempt eminent domain proceedings where the state

---

49 U.S.C. § 10501(b) (2000).

action would "prevent or unreasonably interfere with railroad operations." Maumee & W. R.R. Corp., STB Fin. Docket No. 34354 (S.T.B. March 3, 2004); accord Dist. of Columbia v. 109,205.5 Square Feet of Land et al., No. Civ.A. 05-202, 2005 WL 975745, *3 (D.D.C. Apr. 21, 2005). Even state action couched as an effort to protect the health and safety of local residents is preempted by the broad scope of federal preemption in this area. See Wisc. Cent. Ltd. v. City of Marshfield, 160 F. Supp. 2d 1009 (W.D. Wisc. 2000).

The Village contends, correctly, that whether a certain state action is preempted requires a fact-specific inquiry. However, under the standard set out in Maumee and District of Columbia, there is no question that the Village's intended exercise of its eminent domain power exceeds what is permitted under the ICCTA. The Village is threatening to acquire the entire parcel of land in fee simple. It is not looking for an easement over some small area, as was the case in District of Columbia. Given that the use of the Yard as a transloading facility requires at least a portion of the ten acre tract – the 1600-foot spur of track, the offloading facility itself, storage facilities, roads, and parking – acquisition of the entire parcel by eminent domain would plainly interfere with BSOR's operations.

Dakota, Minn. & E. R.R. Corp. v. South Dakota, 236 F. Supp. 2d 989, 1005 (D.S.D. 2002), *rev'd on other grounds*, 362 F.3d 512 (8th Cir. 2004), does not compel a different result. That case stands only for the proposition that a state may delegate its eminent domain authority to a federally regulated railroad without running afoul of the ICCTA. However, it says nothing regarding federal preemption of state eminent domain action *against* railroad property.

Were the Village to acquire the entire site under New York's Eminent Domain Procedures Law, (N.Y. EDPL §§ 101-709), it would interfere with BSOR's operation of a rail

facility on the site. The exercise of the power of eminent domain against the Yard is thus preempted by the ICCTA as it is currently on the books. <u>See</u> p. 21 *infra*.

Plaintiff also asks for an injunction halting the enforcement of Village "zoning laws, permitting and pre-clearance requirements, and other local ordinances and regulations" that could interfere with its operations the Yard.

The Second Circuit has plainly held that a municipality's zoning and pre-construction permit ordinances cannot be enforced against facilities for transportation by rail. <u>See</u> <u>Green Mountain</u>, 404 F.3d at 640. It has also held that neutral health and safety rules that can be enforced without any exercise of discretion (like fire safety codes) are enforceable in spite of STB preemption. <u>Id.</u> at 643.

As the Village points out, it has not yet attempted to enforce any permit or zoning regulations against BSOR. Its sole concern to date has been halting recycling and waste management operations at the Yard. However, because the Village's ability to regulate the site is limited by the contours of <u>Green Mountain</u>, an appropriate injunction would bar enforcement of any local law or regulation except those that "protect public health and safety, are settled and defined, can be obeyed with reasonable certainty, entail no extended or open-ended delays, and can be approved (or rejected) without the exercise of discretion on subjective questions." <u>Id.</u> What those exceptional regulations might be would no doubt have to abide the Village's attempt to exercise its authority over the Yard, and this Court will not try to predict how the Village might choose to do that.

*2. The Legality of BSOR's Operations Does Not Affect Federal Preemption*

The Village acknowledges STB preemption and the Second Circuit's decision in <u>Green</u> <u>Mountain</u>. But it argues that preemption does not apply in this case, because BSOR's operations as a common carrier by rail at the Yard are unlawful unless the STB grants plaintiff a license (in the form of a certificate pursuant to 49 U.S.C. § 10902) to operate as a common carrier in Westchester County.

BSOR, for its part, contends that (a) its operations are in compliance with the ICCTA, and (b) even if they were not, the ICCTA still preempts local authority over the tracks and their associated buildings and other facilities in the Yard.

BSOR's argument about the legality of its operations presents an interesting, if not entirely novel, question, one that is probably best resolved by the agency in charge of the nation's rail system: the Surface Transportation Board.

BSOR's contention that the Village's argument is irrelevant to the application of ICCTA preemption, however, is a question of law – one that no other case addresses, as far as I know, but a question of the sort that is ordinarily resolved by courts, not administrative agencies.

I conclude that BSOR is likely to prevail on the issue of whether ICCTA preemption applies, because the question about the legality of its operation does not affect the STB's exclusive jurisdiction over the site under § 10501 of the ICCTA. I thus reject the Village's argument that preemption is dependent on the legality of BSOR's operation.

> *a. Whether or Not It Is Operating Legally, BSOR Is a "Rail Carrier" Within the Meaning of the ICCTA, So ICCTA Preemption Applies.*

Section 10501 gives the Board exclusive jurisdiction over "transportation by rail carriers" (including "yards and facilities" of such carriers) and "the.....operation, abandonment or

discontinuance of spur...or side tracks, or facilities, even if the tracks are located.....entirely in one State." 49 U.S.C. § 10501(b) (2000).

Both parties agree that, for the ICCTA's preemption provisions to apply, BSOR must be a "rail carrier" that provides "transportation." And both parties agree that, if BSOR is a rail carrier engaged in the provision of transportation, then the ICCTA preempts local regulation of plaintiff's facilities.

"Transportation" is "the movement of passengers or property, or both, by rail." 49 U.S.C. § 10102(9) (2000). For reasons best known to the drafters of the law, the term "transportation" also includes certain things used in the "movement of passengers or property... by rail," including "yards, property, and facilities." Id. The Yard itself is plainly a "yard [or] facility" used for the transportation of property, which means it falls under the definition of "transportation." Id.

Under the ICCTA, a "rail carrier" is simply a "a person providing common carrier railroad transportation for compensation, [excluding local mass transit operations]." 49 U.S.C. § 10102(5) (2000). Under the literal terms of that definition, BSOR is a rail carrier. Indeed, it is classified as a Class III Rail Carrier by the STB. It provides common carrier railroad transportation for compensation in Buffalo and its environs. And it holds itself out as providing common carriage – and if the evidence is to be believed, it has on one or two occasions provided common carriage – in Westchester County. Therefore, it is a rail carrier.

The provisions of § 10501(b) are clear enough, and they clearly apply to the operations of a rail carrier. There would seem to be nothing more to be said.

But the Village nonetheless contends that the preemption provisions of § 10501(b) do not

because BSOR's provision of common carriage out of Croton-on-Hudson is unlicensed, and therefore illegal. That, it argues, means that BSOR is not really a "rail carrier" – at least, not in this part of the world.

The argument goes something like this: Chapter 109 of the ICCTA (Licensing) provides that a, "Class III rail carrier providing transportation subject to the jurisdiction of the Board may acquire or operate an extended or additional rail line under this section *only if the Board issues a certificate authorizing such activity*." 49 U.S.C. § 10902(a) (2000) (Emphasis added). BSOR is indisputably a Class III rail carrier, and it has not previously been authorized to provide service in Westchester County. The Village argues that BSOR's proposed operation is an attempt to acquire or operate an "extended or additional rail line" without first obtaining the necessary operating authority. Until it obtains that authority, it cannot provide common carriage, so it is not a "rail carrier" within the meaning of the ICCTA and its facility is not within the STB's exclusive jurisdiction.

BSOR responds in two ways. First, it argues that the legality of its Croton operation is irrelevant to the issue of STB preemption over the site. Second, plaintiff contends that the Village is wrong: it did not need to seek approval or obtain any certificate from the STB before commencing operations; neither did it need to file a notice of exemption, as NIR did (without success). BSOR relies on an exception (not an exemption) to § 10902(a): 49 U.S.C. § 10906, which states, "The Board *does not have authority under this chapter* over construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks." BSOR contends that the 1600 feet of track in the Yard is a "side" or "spur" track,

and so its operation in Croton is not considered to be an "extended or additional line."[6]

The Village insists that the question about the legality of what BSOR is doing in Croton-on-Hudson must be resolved before this court can decide whether plaintiff is a "rail carrier" and so is likely to succeed on the merits of its application for injunctive relief. And the Village asserts that the preferred procedure for resolving that question is to refer the issue to the STB and to stay this action until the STB issues a ruling.

If the legality of BSOR's new Croton operation were germane to the reach of section 10501, I would without hesitation refer this matter to the STB. Certainly someone should look into whether BSOR's Westchester operation requires a certificate of authority, and under the doctrine of "primary jurisdiction" articulated by the Supreme Court in U.S. v. Western Pac. R. Co., 352 U.S. 59, 64 (1956), that someone ought to be the Surface Transportation Board. Determining whether BSOR requires a license to operate in the proposed fashion involves far more than simply interpreting the statute. The reviewing authority must decide whether an existing common carrier by rail may expand its base of operations to a new area (which is what BSOR says that it wants to do) without first obtaining a license from the STB by (1) first

_____

[6] The parties in this case have taken what at first appear to be contradictory positions: BSOR, seeking STB preemption of local action, asserts that the STB has no authority over its operations in the Yard, while the Village contends that preemption does not apply because the Yard operations are subject to STB authorization, which has not yet been given (or even requested). These positions arise from the presence of apparently contradictory provisions in the ICCTA itself: 49 U.S.C. § 10501(b)(2), which vests *exclusive jurisdiction* over the construction and operation of side and spur tracks in the STB, and 49 U.S.C. § 10906, which strips the STB of *authority* over the same.

One court has squared these two seemingly contradictory provisions. The Seventh Circuit has concluded that while entities may construct, transfer, or operate side or spur tracks without STB approval pursuant to 49 U.S.C. § 10906, the STB retains exclusive *jurisdiction* over those sites that preempts state or local regulation of such tracks under 49 U.S.C. § 10501(b)(2). United Transp. Union – Ill. Legislative Bd. v. Surface Transp. Bd., 183 F.3d 606, 612 (7th Cir. 1999).

acquiring track that would ordinarily be excepted from STB authority because it is "switch" or "spur" track, and then (2) contracting with other carriers for interchange rights over trackage outside its licensed operating area. This involves analysis, not only of the "intended use" of trackage, see Nicholson v. Interstate Comm. Comm'n., 711 F.2d 364, 367 (D.C. Cir. 1983); but also of the "purpose and effect"of the proposed arrangement. Texas & Pac. Ry. Co. v. Gulf, Colo. & Santa Fe Ry. Co., 270 U.S. 266, 46 S. Ct. 263 (1926); Brotherhood of Locomotive Engineers v. U.S., 101 F.3d 718, 728 (D.C. Cir. 1996). As I learned when I delved (more deeply than proved necessary) into these matters, these are complicated and arcane questions, on which the ICC and STB have spoken in the past (albeit not on these precise facts). Clearly, such matters should be resolved as a matter of national rail policy, not in a piecemeal fashion by unspecialized district courts.

Additionally, in his highly informative letter to the Court (for which I express my gratitude) the General Counsel of CSX advises the court that the STB also exercises considerable oversight over interchange and trackage agreements between common carriers, such as the ones BSOR had told the court it will have to enter into in order to fulfill its common carriage contracts with Coastal LLC and with any future customers. This factor, too, militates in favor of having the STB, not me, look into the legality of BSOR's Croton-on-Hudson operation.

However, I have concluded that these thorny issues need not be resolved in order to determine this motion. Even if BSOR is operating illegally, the site is subject to exclusive STB jurisdiction as long as BSOR is providing common carriage by rail.

I reject the Village's argument that, if BSOR's local operation is illegal (because it is unlicensed), BSOR is not a "rail carrier" for ICCTA purposes in this part of the world. If BSOR

is required to obtain a license from the STB in order to do what it claims to be doing at the Yard, then it is a "rail carrier" that is conducting an illegal operation outside of the area where it is licensed to provide service. But as long as it is providing common carriage for compensation somewhere – and it is – it is still a "rail carrier" within the meaning of the statute. The Yard is a "facility" under the statute, and BSOR proposes to "move property by rail" out of Croton. Under the ICCTA, that is sufficient to trigger STB preemption over both BSOR's operations and its facilities.

It actually makes no sense to subject only properly "licensed" rail carriers to STB jurisdiction. The ICCTA and its predecessor law, the Interstate Commerce Act, were passed in order to subject *all common carriages by rail* to federal oversight – and, not incidentally, to punish any railroad that provided common carriage without complying with the statutory scheme. If BSOR, a Class III rail carrier, is conducting unauthorized common carrier operations from Westchester County, in violation of Chapter 109 of the ICCTA, the statute itself provides remedies: a fine of up to $5,000 per violation per day. 49 U.S.C. § 11901(a), see also Gitomer Aff. ¶ 23. Violations of Chapter 109 (of which sections 10902 and 10906 are part) also carry civil  penalties of up to $5,000 for any person "authorizing, consenting to, or permitting" such violation. 49 U.S.C. § 11901(c).[7]

The procedure for enforcing such violations, which is set forth in Chapter 117, is for "any person," (which would include the Village of Croton-on-Hudson) to file a complaint with the Surface Transportation Board. 49 U.S.C. § 11701(a) (2000). The Board, upon receipt of a

---

[7] As far as this court is concerned, this third-party penalty statute explains CSX's reluctance to do anything that its lawyers believe would violate the ICCTA.

complaint, may commence an investigation and take "take appropriate action to compel compliance," including a civil action for statutory penalties as described above. Id.; see also 49 U.S.C. § 11901(f) (2000). A complaint may be filed by any "person," including a government agency, regardless of whether that entity suffered injury due to the alleged violation. 49 U.S.C. § 11701(b) (2000).

Another remedial section of the ICCTA, 49 U.S.C. § 11702, specifically grants the STB power to seek injunctive relief for violations of Chapter 109 through a civil action. 49 U.S.C. § 11702.

These are the exclusive, Congressionally-mandated remedies for BSOR's purported violation of the ICCTA. Significantly, Congress has not vested the federal courts with authority to impose penalties for a violation of Chapter 109's licensing regulations unless the STB brings a civil proceeding. Certainly nothing in the ICCTA suggests that a carrier's violation of the licensing provisions of that Act renders it and its facilities subject to the jurisdiction of states and localities, thereby thwarting Congress' clear intent that rail carrier facilities of all sorts be created, operated and discontinued only at the behest of the Surface Transportation Board. In fact, section 10501 clearly states that "remedies provided under this part... preempt the remedies provided under Federal or State law." 49 U.S.C. § 10501(b). To put it succinctly, illegal operations by a rail carrier do not preempt preemption.

Therefore, the purported illegality of BSOR's operation in Croton-on-Hudson does not impact the STB's exclusive jurisdiction over the site – at least, while the "yard or facility" is under lease to a "rail carrier" that is purporting to provide "transportation" from that site. Moreover, the "abandonment" or "discontinuance" of what clearly appears to be "spur...or side

tracks, or facilities" would itself be subject to STB jurisdiction, even if the "rail carrier" were not providing "transportation" to and from the site. 49 U.S.C. § 10501(b)(2) (2000). Accordingly, the ICCTA preempts the Village's exercise of eminent domain or other regulatory authority over the Yard, except to the minimal extent permitted by <u>Green Mountain</u>.

### 3. The Doctrine of Unclean Hands Does not Militate Against Entry of an Injunction.

During oral arguments, defendant suggested that plaintiff's request for equitable relief should be denied under the "unclean hands" doctrine.

"The equitable powers of this court can never be exerted in behalf of one who has acted fraudulently, or who by deceit or any unfair means has gained an advantage." <u>PenneCom B.V. v. Merrill Lynch & Co., Inc.</u>, 372 F.3d 488, 493 (2d Cir. 2004) (quoting <u>Bein v. Heath</u>, 47 U.S. 228, 247 (1848)).

The purported fraud, deceit or unfair means that BSOR employed was not identified with precision. If it is BSOR's unlicensed provision of common carriage from Croton, then, as just discussed, the Village's remedy lies elsewhere: it should file a complaint with the STB and trigger the enforcement provisions of 49 U.S.C. §§ 11701-11901.

The very act of leasing the site to a "rail carrier" might also be the unfair means (although it is hard to see how that open and notorious action could constitute fraud or deceit). At oral argument, the Village announced its belief that the lease to BSOR was of a piece with numerous similar transactions that are taking place all over the country when municipalities try to close down noxious or offensive industrial uses of sites within their boundaries. According to counsel for the Village, the practice of placing industrial land containing trackage in the hands of

a real railroad like BSOR – or even an imaginary "railroad" like BSOR's predecessor, NIR – in an effort to divest municipalities of the ability to regulate land within their borders has become so widespread that Congress is convening hearings on the issue, to see whether the ICCTA requires amending.

If indeed these representations by counsel are true (and it is nothing more than a lawyer's representation; there is no evidence in the record of any such widespread practice), then there is reason for concern, since this Court very much doubts that Congress intended such a result. But the very fact that Congress is or may be convening hearings to decide whether it should plug a loophole in the law suggests that, as things stand now, the Village is preempted from condemning or regulating the site, except by application of neutral health and safety regulations as permitted by <u>Green Mountain</u>. Taking advantage of loopholes in laws is a time-honored American tradition. It is not a deceitful or unfair means to an end. And (once again), the Village's remedy lies in a venue other than this Court: it can call Senators Schumer and Clinton and Representative Kelley, and urge them to support an amendment to the ICCTA to correct any manifest injustice that is being worked by the law's loose language.

C. The Equities Balance in Favor of an Injunction

As between the parties to this lawsuit, the balance of hardship tips in favor of plaintiff.

BSOR faces a draconian result if the Village condemns the property: it will be forced to cease operations at the site. The Village has already taken the first step toward condemnation, by holding a public hearing on the possible condemnation of the site at which the Village's need for a new Department of Public Works facility was presented in some detail. N.Y. EDPL §§ 202-203

(2006). If the Village commences a proceeding under Article 4 of EDPL, the land will almost certainly be condemned. The present record before this Court indicates that the land is certainly intended for a constitutionally permissible "public use." See Kelo v. City of New London, Conn., - - U.S. - - , 125 S. Ct. 2655, 2663 (2005). Provided that this requirement is met, an aggrieved party's right of appeal seems limited to the propriety of the condemnation proceedings themselves. See N.Y. EDPL § 207(c) (2006). And under the EDPL, the municipality holds nearly all the cards, with any aggrieved party having little right to participate in the initial determination and limited right to judicial review thereafter. See Brody v. Village of Port Chester, 434 F.3d 121, 132-33 (2d Cir. 2005). Only intervention by a court early in the condemnation process can stave off a taking that the Village is determined to make.

On the other hand, a temporary injunction against further takings or regulatory activities at the site has very little downside for the Village. BSOR asserts that its operations at the Yard will in fact serve the public interest, by increasing the flow of goods into Westchester county, and I can hardly find that an increased flow of goods into Westchester County is NOT in the public interest.

Plaintiff also asserts that its operations pose no risk to the public health or safety, because that it is not in the business of transporting hazardous materials. Feas. Aff. ¶ 42. Significantly, BSOR represented to the Court during oral argument that no shipment of waste materials is planned. On the record before me, that representation is credible. BSOR is not generally in the business of carrying such materials and it does not appear to have any necessary permits from the New York DEC or Westchester County to do so. Counsel has represented to this Court that plaintiff has no immediate plans to carry such waste. (Admittedly, counsel fudged when asked

whether it would so represent for all time). So there does not appear to be any imminent danger that waste management or recycling operations, which the state courts have already found inimical to the health and safety of Village residents, will resume at the Yard. And make no mistake: whatever the Village says about needing a new public works facility, it is the prevention of waste transfer (or similar) operations at the Yard – which seemed a distinct possibility as recently as a year ago – that underlies the Village's interest in exercising its eminent domain powers.

I nonetheless acknowledge that the Village has advised the Court that it wants to acquire the Yard for use as a municipal storage lot for road and sewer trucks, salt, and other such items. Def. Opp. at 3. A temporary ban on the acquisition of this particular site for that purpose, however, is of little moment. Croton has apparently been seeking such a site since the mid-1980s. Id. Only in recent months has it focused on using the Yard for this purpose.

Moreover, in its (understandable) ire at having been blindsided by plaintiff (and its lessor), the Village revealed to the Court that it would have been willing to discuss a division of the site between the portions it might need and the part BSOR wanted to use – if only plaintiff had come to it before commencing a lawsuit. This suggests that the Village may not require the portion of the property devoted to rail-related uses for its public works operation.

In light of the above, I find that the Village's interest in acquiring the site, while real, will not be harmed by the issuance of a preliminary injunction. It will work only a short delay in a process that has taken twenty years to get to this point.

Of course, the public has an interest in prohibiting the provision of unauthorized rail service. And if, as the Village alleges, BSOR's proposed "common carriage" operation out of the

Yard needs to be licensed, there is a public interest in stopping illegal activity.

But that is a general public interest, not an interest of the Village of Croton-on-Hudson. And the public's interest can best be vindicated by appropriate proceedings before the STB – not by permitting the Village to assert regulatory authority in a circumstance where Congress wants that authority to rest solely with the STB.


D. Commerce Clause

Plaintiff also contends that it is entitled to relief under the Commerce Clause of the Constitution, as made actionable by 28 U.S.C. § 2201 (Count II) or 28 U.S.C. § 1983 (Count III). The Commerce Clause preempts state regulations that place a disparate burden on interstate commerce clearly excessive in relation to local benefits. United Haulers Ass'n Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth., 438 F.3d 150, 156-57 (2d Cir. 2006).

"It is a fundamental rule of judicial restraint, however, that this Court will not reach constitutional questions in advance of the necessity of deciding them." Three Affiliated Tribes of Fort Berthold Reservation v. World Eng. PC, 467 U.S. 138, 157, 104 S. Ct. 2267 (1984). Where, as here, plaintiff has prevailed on its first cause of action, there is no need to reach the question of whether it has stated a valid constitutional claim under the Commerce Clause.


**The Terms of the Injunction**

Plaintiff's motion for a preliminary injunction against the Village's acquisition of the Yard by eminent domain is granted. However, this injunction is conditioned on (1) BSOR's posting of an undertaking with the Court in the amount of $100,000; and (2) BSOR's continued

refusal to accept solid waste materials at the Yard.

The setting of a bond requires little or no explanation. Fed. R. Civ. P. 65(c) provides, "No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper." That language has been held to vest "wide discretion" in the district courts to set the bond amount. Doctor's Assoc's, Inc. v. Stuart, 85 F.3d 975, 985 (2d Cir. 1996). It is the determination of this Court that $100,000 is an amount sufficient to redress any possible harm to the Village as a result of the injunction's delay in the condemnation of the site.

The other condition I am setting on the preliminary injunction requires more fulsome comment. A district court, in the exercise of its equity powers, may "impose conditions requiring maintenance of the status quo.... when the injunctive powers of the court are invoked and the conditions are necessary to do justice between the parties." Brotherhood of Locomotive Engineers v. Missouri-Kansas-Texas R. Co., 363 U.S. 528, 531-32, 80 S. Ct. 1326 (1960); accord U.S. v. Bedford Assoc's, 618 F.2d 904, 914 (2d Cir. 1980).

Without question, the "status quo" at the Yard includes the absence of waste management, storage, or transshipment operations. The Village has litigated that position extensively, and won. While I have concluded that the prospect of harm resulting from the shipment of waste materials to and from the Yard is (at present) remote, the Village is legitimately concerned about that prospect. Before any railroad was involved with this site, the Village received two decisions from the State Supreme Court that shut down the waste management operation at the site. The timing of the lease, without more, suggests that BSOR's acquisition of an interest in the property is as much a litigation tactic as a business decision. The

Village knows nothing about the relationship between BSOR and NIR, Greentree and Metro Enviro, because BSOR's very existence, and its lease, appear to have been kept carefully secret from the Village until the commencement of this lawsuit..

During oral arguments, the Village proposed that BSOR be enjoined from operating common carrier operations at the Yard altogether while the STB addresses the underlying matter.[8] I treat that request as a cross-motion for a preliminary injunction, and I deny it, because the Village has not demonstrated that it and its citizens will suffer any irreparable harm in the event that BSOR commences shipment of non-hazardous materials at the Yard. At present, the only threat of harm to the Village comes from increased truck traffic and commercial activity in the area. Since BSOR cannot begin any significant operation at the Yard as long as CSX harbors legitimate doubts about the legality of the contemplated enterprise and appears unwilling to handle shipments bound for the Yard without having those issues resolved, the minimal risk of harm to the public interest does not create sufficient reason for this Court to enjoin BSOR's operations.

Nonetheless, I acknowledge the Village's abiding interest in preventing the commencement of waste management and recycling operations at the site, and I conclude that the equitable remedy of injunction *pendente lite* should be conditioned on the maintenance of the status quo as ordered by the state courts: no waste hauling of any sort. This condition allows BSOR to operate without opening up the can of worms that would result if this court were to issue an order that, in essence, overturned the work of the New York State Supreme Court.

---

[8]The Village also offered that it would agree to halt its eminent domain proceedings voluntarily if BSOR agreed to halt all operations at the Yard *pendente lite*. That offer was rejected by BSOR's attorney.

Nothing in the ICCTA requires me to ignore the fact that the state courts, over years of litigation concerning this site, have expressed a concern about the conduct of waste management and recycling operations in the Yard, and have enjoined other parties (albeit not plaintiff) from conducting such operations. In view of the findings of those courts, sitting in equity, I conclude that it is appropriate to maintain the status quo *vis-a-vis* waste management until there is some final resolution of the matters contested in this lawsuit.

If the Village intends to persist in its argument that the site is not within the exclusive jurisdiction of the Surface Transportation Board, and can convince me that the resolution of that question is necessary to the final resolution of this lawsuit, I will, as indicated previously, refer appropriate questions to the STB for resolution.[9]  This action would have to be stayed during the pendency of any such reference. Reiter v. Cooper, 507 U.S. 258, 268, 113 S. Ct. 1213 (1993). However, I decline to make such a reference now for two reasons: I do not believe reference is necessary to the resolution of this motion, and the Village may wish to take an immediate appeal from the entry of the preliminary injunction.

## Conclusion

For the reasons stated above, BSOR's motion for a preliminary injunction halting the Village's eminent domain proceedings is granted. This injunction is conditioned on BSOR's

---

[9] At present, it appears to the court that the following questions should be answered by the STB: (a) whether BSOR's operations at the Yard as a common carrier by rail constitute the operation of an additional or extended line of rail under the authority of the Board under 49 U.S.C. § 10902, and whether BSOR can avail itself of the statutory exception under 49 U.S.C. § 10906; (b) whether, if a certificate is required for its operations, such a certificate should be granted. There may be other questions to be referred as well.

The Village's cross-motion for an injunction of all BSOR activity at the Yard is denied.

This constitutes the decision and order of the Court.

Dated: June 12, 2006

_____
U.S.D.J.

BY FAX TO ALL COUNSEL